BENJAMIN BIRTIS GREEN v. STATE.

184 So. 504.

Opinion Filed November 15, 1938.

*Wm. A. McRae, Jr.,* and *Charles E. Bennett,* for Plaintiff in Error;

*George Couper Gibbs,* Attorney General; and *Tyrus A. Norwood,* Assistant Attorney General, for the State.

BUFORD, J.—The writ of error brings for review a judgment of conviction of the offense of rape with recommendation to mercy.

It will be necessary for us to disregard the questions contained in plaintiff-in-error's brief because they are not in accordance with amended rule 20.

It is contended (1) that the evidence is insufficient to sustain a verdict and judgment of guilty; (2) that the Court

erred in refusing to grant defendant's motion that the Court
room be cleared of spectators and (3) that it was reversible
error for the Court to refuse defendant's requested instruc-
tion defining "array of force," the Court having failed in
its charge to define said phrase.

Our Statute, Section 5051 R. G. S., 7153 C. G. L., defines
rape as follows:

"Whoever ravishes and carnally knows a female of the
age of ten years or more, by force, and against her will, or
unlawfully or carnally knows and abuses a female child
under the age of ten years, shall be punished by death or by
imprisonment in the State prison for life. It shall not be
necessary to prove the actual emission of seed, but the crime
shall be deemed complete upon proof of penetration only."

One of the definitions given in Baldwin's Century Edition
of Bouvier's Law Dictionary is:

"The knowledge of the woman's person must be *forcibly*
and *against her will*; and if her consent has not been volun-
tarily and freely given (when she has the power to consent),
the offense will be complete, nor will any subsequent acqui-
escence on her part do away the guilt of the ravisher. A
consent obtained from a woman by actual violence, by duress
or threats of murder, or by the administration of stupefying
drugs, is not such a consent as will shield the offender or
turn his crime into adultery or fornication;"

In Doyle v. State, 39 Fla. 155, 22 Sou. 272, this Court
defined rape as follows:

"Consent of the woman from fear of personal violence is
void, and though a man lays no hands on a woman, yet if
by array of physical force he so overpowers her that she
dares not resist, his carnal intercourse with her is rape."
See also Rice v. State, 35 Fla. 236, 17 Sou. 286; Peterson v.
State, 90 Fla. 361; 106 Sou. 75.

The jury was the judge of the weight of the evidence and

of the credibility of the witnesses. The accused was a white man, crippled to some extent with rheumatism or some affliction of the back and probably one hip, but he was physically able to work as a timekeeper on a WPA job and was physically able to drive an automobile and a reputable physician testified that he would not be precluded by his physical ailments from perpetrating the act charged in the manner in which the prosecuting witness testified that it was accomplished.

The prosecuting witness, the alleged victim of the assault, was a negro girl fifteen years of age. Her statements in evidence, if true, and the jury evidently believed that they were true, were sufficient to establish the fact that the accused persuaded her to go with him in an automobile from her home for the purpose of taking work in his home, to assist in taking care of his children, but that he had no such intention in his mind when he took this girl from her home but that he took her from her home for the purpose and with the intention of having carnal intercourse with her; that he drove to a secluded spot some five or six miles from where he took the girl into the automobile and there, against her consent and against her will and by putting her in fear by threats to then and there kill her if she did not submit, had carnal intercourse with her.

A reputable physician examined the girl within a few hours after the offense was alleged to have been committed and he testified as follows:

"The girl was stripped off, and examined all over the body for bruises; especially of the breasts, arms and thighs; and none were found. With particular respect to the examination of her private parts, she was put on the table in the ordinary way for an examination, where they lie down and put their feet up, so you can get to the vagina and see it well with light and instruments. The hymen—we call it in

medicine, you call it the maidenhead—I am reading from my notes that I made immediately at that time, in my own handwriting, and put under lock and key and nobody had access to it but me. The hymen or maidenhead had a larger than normal central irregular opening. It was well preserved on the edges. The fringe of it that had dropped down from where it had been torn recently in several places, was bleeding, and it bled when I examined it. The blood was of recent origin, as I saw some in the step-ins that she had, and took off at the time of the examination. And about her—between the folds, and around her legs, there was blood there, fresh. Of recent causation. Examination of the opening was very painful, because of the recency of the injury. This finger, however, was inserted some distance. About so far (indicating), into the vagina, causing her a great deal of pain, because of the recent injury, which was evident from the blackened edges of the hymen, or maidenhead, which, as has been stated, was torn in several places.

"Q. Now Doctor, you speak of the injury. What part of the private parts of this girl were injured?

"A. As stated, to the hymen or maidenhead.

"Q. Well, could you tell from your examination as to whether the private parts of the vagina, in this girl, had been penetrated?

"A. I do think they had been penetrated a short distance; enough to rupture the maidenhead.

"Q. Could you tell from your examination of Alvera Graham at that time whether or not she was a virgin prior to the injury which you saw?

"A. She was. She was prior to that time, a virgin. Yes, sir."

The defendant admitted that within a few minutes after he got the girl in the automobile with him, on the pretense

that he was taking her to his home to work, that he began to talk sex matters to her; that instead of taking her to his home he took her to the secluded spot in the woods indicated by the girl and that there he proposed to have sexual intercourse with her but, upon her declining to agree to his proposal he made no effort to, and did not, have intercourse with her.

The undisputed evidence is that the girl got out of the car in some way at the place where the crime was alleged to have been committed and walked back home, which gives further credence to her version of what happened. She testified positively that the accused threatened to kill her if she did not submit and that she believed he would kill her; that he had an ax and some carpenters tools in the foot of the automobile with which he could have killed her and that she yielded only because of fear. This makes out all the necessary elements of the crime of rape.

The second contention is based upon the action of the court in connection with a motion made by counsel for the defendant. After the jury had been sworn, the following occurred:

"MR. BENNETT: If it please the Court, we would like to make a motion at this time to exclude people other than witnesses, and any officers of this court.

"MR. HALLOWES: What was that?

"THE COURT: Wait, let this jury go out, first.

" * * * And thereupon the tentative jurors were excused and retired from the court room until 3:30 o'clock P. M., Thursday, December 9, 1937.

"THE COURT: Let your motion be stated so we can get it on the record.

"MR. BENNETT: The defendant, B. B. Green, comes now and presents his motion before this Honorable Court to the

effect that he requests that this Court make an Order decreeing that all spectators be excluded from the court room during the pendency of this trial, excepting only the court officers and witnesses.

"THE COURT: Your motion is denied. Our courts are open and free to everyone; and, of course, everyone is entitled to a fair and impartial trial, and the public generally is entitled to come into the court room, provided there is room enough for them, and provided that they behave themselves in an orderly way. Of course, if there is any testimony in this case which might be revolting to ladies or others, they will have leave to retire; but I want it thoroughly understood that our courts are entirely open to the public at all times.

"MR. BENNETT: Your Honor, if I might, I wish to state the grounds on which we are making this motion; that is, to the effect that this trial will be a trial involving things indelicate in their nature.

"THE COURT: Well, there are a great many indelicate things that happen in court. You can't control that. As I said, if anybody wishes to retire, they can do so. That is a matter for them, and not for the defendant, as I see it.

"MR. BENNETT: This right is the right that rests with the defendant, and when he makes the motion, the Court has the right, in its discretion, to grant it.

"THE COURT: I have ruled on it. I have something else to do. Have you anything to say, Mr. Hallowes?

"MR. HALLOWES: No, sir, your Honor has ruled.

"THE COURT: Well, I would like to hear from you.

"MR. HALLOWES: Well, under the Constitution, the defendant is entitled to a fair and impartial trial, and in cases of this kind, my experience has been that before such delicate or revolting testimony may be brought out, it is discretionary with the judge to counsel the spectators to retire.

24

"THE COURT: · Certainly; I always do that. There are a great many things that come up that cannot be avoided.

"MR. McRAE: The court has ruled and the State Attorney has spoken, but I would also like to be heard. There will be two ladies we wish to call on in the defense of this thing. Throughout our discussion with them, they have been petrified at the thought they will have to talk. I strongly believe that the truth can be much more readily elicited, and much more easily, if it were not before the morbid spectators.

"MR. HALLOWES: The same is true of prosecuting witness. It may be true of any witness in this cause.

"THE COURT: I am of the same opinion, and I therefore deny the motion and note your exception."

The record does not show wherein the defendant in the court below was injured or prejudiced by this action on the part of the court. The witnesses referred to were not even named by defendant's counsel and there was nothing to show of what relevancy, if any, their testimony would be, or might have been. There is nothing to show that either of the witnesses referred to were ever called to the stand and that they ever objected before the court to testifying in presence of the spectators in the court room. For good cause shown it may become the duty of a court to exclude spectators, but unless it be shown that the exclusion of spectators is needful to the end that the defendant may have the benefit of all his legal rights, there can be no error in the court's refusal to exclude spectators. The mere fact that some witness may be called who is not willing to testify freely in regard to certain facts before spectators is not sufficient.

The record does not show that defendant was deprived of the testimony of any witness because of the action of the court.

The third contention is that the court erred in refusing to give a special charge requested by the defendant in the following language: " 'An array of force,' gentlemen of the jury, means a regular and imposing arrangement of the means of doing physical violence which violence must be impending." We hold that this particular charge was properly refused because it would have tended more to confuse than to enlighten the jury and because the general charge of the court was sufficient to cover the law in regard to force essential to the commission of the crime of rape. In that regard he charged the jury as follows:

"Consent by a woman to sexual intercourse induced or obtained through well grounded fear of death or great personal violence is void; and if you believe from the evidence in this case, beyond and to the exclusion of every reasonable doubt, that though the defendant Benjamin Birtis Green, laid no hands on the prosecutrix, Alvera Graham, yet that by such fear induced by threats and by an array of physical force he so overpowered and paralyzed her mind that she dared not and did not resist him and that under such circumstances he had carnal intercourse with her, then his act would be rape and you should find the defendant guilty; but if the evidence raises in your mind a reasonable doubt as to whether or not at the time of any carnal intercourse you believe took place, her mind was so paralyzed and overpowered by such fear and force and as to whether or not such intercourse was obtained through force and against her will, then you should find the defendant not guilty."

The jury, who were of the same race as the defendant on trial, heard the evidence, saw the manner and demeanor of witnesses on the stand and weighed the evidence and considered the credibility of witnesses and returned a verdict of guilty. The trial judge, who heard the testimony, approved the verdict by denying motion for new trial.

On consideration of the whole record, we find no reversible error and, therefore, the judgment should be and is affirmed.

So ordered.

TERRELL, C. J., and WHITFIELD, and BROWN, J. J., concur.

CHAPMAN, J., dissents.

THOMAS, J., not participating.

CHAPMAN, J. (dissenting)—Counsel for plaintiff in error contend that the trial court abused its discretion in overruling and denying the motion of the defendant to exclude spectators from the court room during the progress of the trial. Counsel for defendant below suggest in support of the motion that the defendant desired to call two ladies who would give valuable testimony in behalf of the defendant during the trial of the cause. That defendant's counsel had been in consultation with the two ladies and that they were petrified at the idea or thought that they would have to appear in open court filled with people whose presence would be of no service or value to the defendant and drawn there by prurient curiosity. It would be extremely difficult, even when assisted by the process of the Court, to obtain the testimony of the two ladies in defendant's behalf before a crowded court room where the testimony would be available and could be used by the defendant in his behalf touching the issues to be settled by a jury. The nature of the testimony, other than its importance and materiality, was not made a basis of the motion to exclude the morbid spectators from the court room. This Court had before it a motion to exclude spectators from the court room in the case of Robertson v. State, 64 Fla. 437, 60 So. 118, when it was said:

"The third assignment of error challenges the action of the court below in ordering the doors of the court house to be closed and the general public to be excluded during the

trial, excepting the court officers, the jury, witnesses, attorneys representing the parties, and all persons directly interested in the case.

"In the case of People v. Swafford, 65 Cal. 223, 3 Pac. Rep. 809, it was held that the word *public,* as used in the constitution guaranteeing to all persons accused of crime a public trial, is there used in opposition to *secret,* and that the constitutional requirements are fairly observed, if without partiality or favoritism, a reasonable portion of the public is suffered to attend, notwithstanding that those persons whose presence would be of no service to the accused, and who would only be drawn thither by a prurient curiosity are excluded altogether. Cooley's Const. Lim. (6th Ed.) p. 379. In Abbott's Trial Brief (Crim. Causes) Sec. 157, the rule is tersely, and as we think, correctly stated, as follows: 'The exclusion by the court of all persons other than those interested in the case, where, from the character of the charge and nature of the evidence, public morality, would be injuriously affected, does not violate the constitutional right to a public trial.' People v. Hall, 51 N. Y. App. Div. 57, 64 N. Y. Supp. 433; Grimmett v. State, 22 Tex. App. 36, 2 S. W. Rep. 631." See 8 R. C. L. 77; 16 C. J. 807-8; Roberts v. State, 100 Neb. 199, 158 N. W. 930; Ann. Cas. 1917E 440.

It is clear to my mind that the plaintiff in error was deprived of valuable testimony throwing light upon the issues by the denial by the trial court of the motion to exclude from the Court room the morbid spectators. It is theoretically argued that the legal rights of the plaintiff in error were not invaded when the motion to exclude the spectators was denied, because the two lady witnesses in question were within the jurisdiction of the court, amenable to its process, and the testimony available. Such a conclusion can be reached only by theory because experience has taught practitioners at the bar that ladies, appreciating their social

28

standing, fear of criticism, are reluctant to testify in any court proceeding, and certainly would not appear in a case like the one at bar then being tried, regardless of the process of the Court to bring them to the trial. The witnesses had a knowledge of the physical condition of plaintiff in error and had observed it over a long period of time and from their testimony it would be a reasonable inference that the defendant was physically incapacitated to commit the alleged crime. One of the witnesses was served with process but did not appear at the trial. It appears to the writer of this dissenting opinion that the ends of justice require a new trial. When a defendant is deprived of material testimony tending to show physical incapacity to commit the crime and otherwise to contradict damaging testimony offered against him, it does not appear that right and justice has prevailed as provided for in Section 4 of the Declaration of Rights of the Constitution of Florida. I think a new trial should be granted.